Good afternoon. My name is David Merchant. I'm an assistant federal defender from Montana. Anthony Gallagher is the executive director of our program. I would ask to reserve two minutes for rebuttal. On this historic day, I'm reminded that the U.S. Constitution, the laws of the land, the cases decided by courts in this country are not for the protection of the government, are not for the protection of the police, but are for the protection of the individual's rights against the government and against the police. This is one of those cases, your honors. The laws also exist to protect us from crime, do they not? Absolutely. And there's no challenge here that the officers were investigating a burglary that had just occurred and that the truck that had been stolen in the burglary had been observed in the vicinity where your client was first contacted. Is that correct? Well, I'd agree with most of that, your honor. A truck was observed further up the road. With the number one printed on the side, right? And that was the unit number of the rural electric company whose truck had been stolen? It was, your honor. And that was the truck that was taken in the burglary? Ultimately, we find that to be true. Moreover, didn't the officers find your client dressed in what, given the weather and the location, seemed to be really almost like he was out at the beach in a winter situation, and he had a necklace, or not a necklace, but an expensive range finder around his neck. Wouldn't you say that certainly to the degree of a Terry stop, the officer certainly had plenty of reasonable suspicion to stop your client, did he not? No, your honor. You do not think so? Why is that? I don't think so. Two things. First of all, when, as Officer Johnson testified, the two cars were coming around a corner. There's about a foot of snow on the ground. It's a two-track, which is a seasonal road in Montana, unkept in the winter. They see a man. They pull, and as Officer Johnson tells you, he is in the second car. They pull within 20 feet of Mr. Howe. Get out of the car. He is wearing overalls, he's wearing a jacket, and he's wearing high-top shoes. Now, I think the government's going to say that's inappropriately dressed. I don't know. Quite candidly, I get hot. I'm running around in a T-shirt and shorts all winter long simply because I'm kind of heavy. But the officer testified that one of the reasons that he contacted your client was out of a welfare check, a concern that because he was not appropriately attired for the cold weather, he was worried about his physical condition. I absolutely disagree with that statement, your honor. The officer never said that. What happens is, again, the officer stops 20 feet away, walks up to him and says, what are you doing here? To which Mr. Howe replies, just walking around. And at that point, the officer then puts my client in handcuffs and begins the Terry Frisk. He tells him. Before we get to the Terry Frisk, though, didn't I read? Yes. I believe it's page 54 of the excerpt of record. Ms. Suk is examining the officer, and the question was, we basically, Officer Johnson, after you saw Mr. Howe walking down this road in the location that you described, what did you and your fellow officers do? And the answer, we basically stopped to check on him. Why? Well, with the conditions, with the weather conditions and the location that he was at, first off, for his welfare. Yes, but that directly contradicts what Officer Johnson actually did. What Officer Johnson actually did was, after he stopped the car, he walked up to Mr. Howe and said, what are you doing here? To which Mr. Howe replied, just walking around. He then said, we're investigating this crime, we're taking you in for custody, handcuffs him. Well, at that point, as Judge Smith asked you, hadn't the officer seen that he was wearing this expensive range finder hanging around his neck? Well, he noticed that there was something around his neck, and, in fact, Officer Johnson says, I got there where I was within about six feet, I noticed that. So when he stopped to get out of the car and approach him, he didn't notice that. So that's stuff that he is taking in. But, again, a welfare check, you would assume, would say, what are you doing here? Are you okay? There would be other questions. The one question that was asked is, what are you doing here? And the next thing Mr. Howe knows is he's being handcuffed, he's being frisked, and he's being arrested. Does the record indicate whether either of the officers knew your client and had any previous experience with him? Yes, Officer Johnson testified that he did know my client from a previous call in which there was a domestic violence question. Hadn't he also had contact with him on a prior assault on an officer? Well, I think that that's merged into the same where they responded to the same event. At least that's the impression I got. He also testifies that he's not a known mountain man, which we never explored, quite candidly. We never explored at the suppression hearing because I'm not sure what that word could mean. That term doesn't have meaning in Montana? I'm sure it does, Your Honor. I'm from Michigan. Well, but we're dealing with Montana, Mr. Burchett. Ted Kaczynski, probably a mountain man. Known or unknown, I'm not sure. People who wander up, this is a BIA officer who probably has a regular beat. He may or may not know the people who live in the mountains. Again, we didn't explore that line of questioning, so I don't know the answer to that. Can I just get back to the Terry issue again? I gather from your briefs that you contend that there was not even reasonable suspicion or, indeed, that there isn't any basis for a Terry stop. Is that still your position? No, there is a basis for a Terry stop. I believe that the government, the police officer needs something more than It's the way that the events occur. It's the, what are you doing here, I'm investigating a crime, and I'm taking you in. That's the start of it. And then he goes and he places him in handcuffs and then begins the Terry frisk. There's nothing at all that says that he had weapons or that he was thought to be dangerous or any of those things. And I think for a Terry, there has to be a reasonable suspicion that he poses a danger. I think we have a line of this. He had a bulge in his pocket, did he not? I mean, we're going to get to that in a minute about the prescription drug bottle. But seeing this man that, as you've indicated, they previously had some experience with on a domestic violence where an officer may or may not have been assaulted, a known person, a bulge in his pockets, why are you questioning the Terry effort? I understand about your concern about whether they went too far with the Terry search. But up to that point, are you seriously contending that there was no basis to stop this gentleman and to conduct a Terry stop, a Terry search? No, I'm not suggesting that. If Officer Johnson's actions are deemed to be correct, he absolutely should perform a Terry frisk if he's arresting somebody. So then the case really turns on whether or not he went too far in the pat-down frisk, doesn't it, Mr. Murray? I think actually, yes. The initial arrest, I think, is a problem because he's arrested really with no probable cause whatsoever. And then the Terry search goes beyond the scope. I guess for purposes of my question, and I want Judge Reevely to have a chance here, if you assume for purposes of our hypothetical that there was reasonable suspicion to justify the initial Terry stop, your fallback argument is you still win because the officer went too far. Yes. Okay. In fact, the officer was questioned about the bulges, and he testified that, in fact, none of them felt like a weapon to him. Later on, I'm sorry, Your Honor. Well, I'm sympathetic to that argument, as was the trial court. The trial court first suppressed on the grounds it was too far, going in his pocket, if it's just a Terry stop. Yes. Then the trial court, looking at all of this totality that we've suggested here, the circumstances of where he was and when he was and how he was dressed and what his pockets looked like from the outside and the range finder, then the trial court said he was seized when he came to the car, when he was handcuffed. He had probable cause. All right. In the course of an arrest, he's certainly entitled to look at that bottle and see who was the patient. So that, to me, is the critical question. Was there, in the totality, enough to change the trial judge's mind about not the Terry stop but the arrest? I would argue to you, Your Honor, that the second order, the do-over, was based on the fact that the one fact of whether or not Officer Johnson called Mr. Howe to the car or whether Officer Johnson went to Mr. Howe. Based on United States v. Kim, that was the case that the court held its head on, they said there wasn't a seizure. It wasn't an investigatory stop because the officer approached him. He was friendly. There was an almost cordial behavior between the two. But my argument is this. In all of those cases, what really matters with this is exactly what was found in United States v. Kim, where officers detain an already stationary subject by hindering his future as opposed to his ongoing process, that they did not stop the suspect as a term commonly understood. The problem becomes they stopped his ongoing process, his progress down the trail. They didn't, in Kim, stop him. Kim is an investigatory stop case. We're not arguing that this is not an investigatory stop. They should have gotten out of the car and said, hey, what are you doing up here? This is a bad condition. But they didn't do that. And the fact that they immediately put him in handcuffs and immediately began the Terry frisk tells you that the intent of the officers and the government says intent doesn't matter. But that's not what Stewart stands for. They rely on Brigham City. You're shaking your head, Your Honor. It troubles me that you would limit an officer. The fact that he handcuffed him to me is very significant. It would bother me about limiting the officer to simply a frisk. And not being sure that you disarm him in view of everything you've seen, everything you know about the circumstances. That's bothering me. I guess I don't understand your question. It bothers you that they handcuffed him or it bothers you that? You would subject an officer to the danger of someone under all of those circumstances that he knows. I guess I would argue to you that the burglary, the theft of the automobile, the circumstances that the driver and the guilty person is abroad somewhere, he's found under those circumstances in that dress. His pockets are bulging. There's something around his neck that may be significant. And he says he's just walking along. It seems to me that the officer is entitled to protect himself and make every assumption in his favor of his safety. Two things. The range finder doesn't come into play until later. The officer doesn't know that the range finder is involved. At first, he didn't recognize how valuable it was. Well, he didn't know that that was taken from the burglary. The second thing, Your Honor, is – and I'm taking this – I would truly hope the court isn't suggesting that when the police begin any conversation with a person down on the street that they believe may be a suspect, that they should be able to handcuff them. Of course not. That's what happened here. I didn't ask that question. Your Honor, if this was a community caretaking situation, the questions would have been different. The actions of the officer would have been different. The actions of the officer speak to the fact that as soon as he got out of the car, he was going to arrest this man, regardless of what occurred with the conversation. I think we understand. I will pass my time. Yeah, you are. But I'll give you a minute on rebuttal. Thank you. But I appreciate your presentation. Ms. Suk. Good afternoon. Laurie Suk for the United States. I think that it's dangerous to focus on only one thing going on in this circumstance. The defense seems to focus solely on the fact that there was an intent of the officers to arrest. I think we need to look at the reality of what the officer was dealing with here, or the totality of the circumstances. They had information that a truck, and a specific truck with the number one, was on this road. Before they encountered the truck, they encountered Mr. Howell. There was no other place he could have come in. Can I interrupt just to ask this question? Is it the government's position, as intimated but not pursued in the briefs, that there was not just reasonable suspicion, but probable cause to arrest the defendant? In hindsight, Your Honor, I believe that I should have argued that from the outset. Is there sufficient information in the opening brief and in what was alleged before the trial court to permit us to consider this as if you had alleged, or rather, saying that you did allege there was probable cause? Yes, Your Honor. I believe there is, and I'll tell you those facts, because then you would actually, maybe this is where you're going. You would have an incident of search incident to arrest. Your opposing counsel raises, because of course he legitimately raises the point, that if the officers acted directly, not on the basis of a Terry stop, but right from the get-go were going to arrest him, then they had to have probable cause. So let's get right to it. Was there probable cause based upon what was shown in the record, what was indicated to the trial court, and what was shown in your opening brief? Yes, Your Honor, there is, and these are the facts. They knew prior to going up that road that the truck that was stolen from the Bighorn Electric, this is the truck, white with the number one insignia, and also the ranchers looking through binoculars saw a person there. They're going up the only road, this is a seasonal one-car road, and they encounter Mr. House. There's no other direction he can be coming from. This is a mountainous area, one-and-a-half feet of fresh snow, so you're going to be walking on the road, if at all. They encounter him totally unprepared for the circumstances they find him in. Do we know how far he was from the truck at the time they encountered him? That's not in the record, Your Honor. I looked and I didn't see it. No, I did not ask that question. And it was they followed after the fact, and I actually, if you saw in my direct, was getting there. Yeah. They followed it, and I was going to ask that, but I didn't go further. In the heat of battle, it got over. I did not do that. I did not. But they were on that road, and these are BIA officers that not only know Mr. Howe, but know the area. And there is discussion in the record about how they were dressed, and clearly he was in a windbreaker and tennis shoes. He had not just a bulge, he had bulging pockets and a range finder around his neck. That certainly at the time, that was not a piece of equipment specifically that was reported missing, but the officer knew that was an expensive piece of equipment and knew Mr. Howe. Were any of the three officers, I know that they were at the scene of the burglary, but how much information did they know about what had been taken? They knew that a truck was taken with all of the equipment from the employee, Casey Munter, whose truck was taken. So they knew that there was a truck and that he had his work equipment there. But they didn't know specifically a range finder. I'm not going to tell you they had a list of everything that was taken, but they knew that a truck with the equipment was taken. And what they found as well was that Mr. Howe, I mean, for example, let's just give an example. What if Mr. Howe was saying that I'm training for the Olympic triathlon or the decathlon or I am a mountain climber? You know, he didn't say that to them. He said I'm out for a walk. And so with all of that, coupled with what they saw, I really should have argued there was probable cause for an arrest. But you did in the trial court. I did. And got the trial judge to change his order. I did, yeah. And I, excuse me. Well, I was going to say, let's pursue it a slightly different way. Let's assume for a moment that the officers had not encountered Mr. Howe on the road, but they knew where he lived. Based upon what you just explained, would they have been able to get, in your opinion, or as evidenced by the record, a search warrant to permit them to go to Mr. Howe's house and search? They would have had to have, there would have had to have been some connection to Mr. Howe. There was no report at the time of who burglarized the co-op. So the location here was important in its proximity to the truck because it gave them an identity. The ranchers weren't able to tell them just that a person was there. So if you're asking if they hadn't encountered him at all, they just drove right up to the truck, and there was nothing in the truck that told them that it was Mr. Howe. I'm not sure that they would have even known to go to his house. Okay. Let's skip to another matter, if we may. Certainly. Let's assume for a moment there wasn't probable cause, but that there was reasonable suspicion, and they did the frisk. They patted it outside of his pocket, under carry, no problem there. But when you get to the prescription bottle and you look at the deposition of the officer, does it not seem clear that the officer did not believe that the prescription bottle was a weapon? Well, he didn't open the bottle. I understand that, but when he took it out of his pocket, he knew it wasn't a weapon. What he testified to was that he felt objects large enough and hard enough to be weapons, and he pulled those objects out. But he went farther than that, did he not? I'm looking at page 26, just to see if this is your understanding. I don't know what it is in the excerpts of the record. 26 of my brief? Yeah, 26. No, this is the testimony of Officer Johnson. It's on page 26 of that. Okay. I can find it. Starting at line 20, question, okay, but they didn't feel. If they felt like weapons, you would have put that in your report, wouldn't you have? Answer, yes. Question, and you didn't do that. You didn't indicate that anything felt like a weapon. Isn't that true? Answer, yes. Question, so you just emptied out his pockets. Answer, correct. Was he handcuffed at the time? Answer, yes, he was. So at the time, he wasn't free to leave. Answer, no, he wasn't. Question, he was under arrest. Yes, essentially he was. So the officer indicated then that when he took this out, he did not think it was a weapon. Well, here's what I'll point out to you, sir, Judge Smith. I rehabilitated him in redirects specifically for the reason that I think the officer was making a distinction in his mind there. It's clear that he did not put that in a report, that he believed that there were weapons, that there was places in his direct examination and then also in redirect where I asked him specifically to clarify. When you were feeling those bulges, did you know if they were weapons? And he said, no, I didn't. Can you just end the record where that might be, please? Yes, I can. Try ER-76. That's exactly right. Okay, it's, sir, you testified that you saw his pockets in his jacket bulging. Yes. It was obvious enough that you saw that when you were walking up to him. Correct. Now, you've testified that you had no suspicions with those bulges that there were weapons. Actually, I had suspicions. That's why you patted him down, right? Yes. And after you patted him down, could you tell what was in his pockets? No. Did you know if they were weapons or not? No, I did not. By the feeling of them, were they hard or soft items? Hard. Could they have been weapons? Yes. And is that why you looked in his pockets? Yes. Okay, so what you're saying is that at ER-76 you rehabilitated him. That corrects what would otherwise seem to be a problem with respect to Terry, right? It is, and I believe that he did not write that in his report, and that's what he was being questioned about. During cross-examination, everything that he did and testified about that he believed or did, the things that he did not write in his report, it was clear he didn't write the perfect report. Judge Reedley, I would just say that the government does have the same concern that you raised with the defense about what, if the officer isn't allowed to do what he did here, what should he have done? Because it's really clear at the start that they were going to put him in their cars and take him back. He's 12 miles in nowhere. They're in bad conditions. But he's under arrest at that point, right? He is. But they're not going to put him in their cars without finding out what is in his pockets. Understood, but they still have to have probable cause to arrest him. They do, or reasonable suspicion, and then it could be in the encompassing of Terry's stuff. Well, the very fact they handcuffed him before they ever touched him is pretty good indication to me what their thinking and plan and intention was. Absolutely, sir. There was never any doubt that they were on that road, and when they encountered him, the intent, of course, was Mr. Howe is the one who took this truck. There's no one else there. I tried to give some examples. I mean, this is not somebody walking down a road that there could be lots of people on. This is the only way he could come from that. In effect, you are agreeing with opposing counsel that from the beginning the officers were going to arrest Mr. Howe. Their intent, certainly. And I think from the beginning as well, Judge, you can say that they also, when they saw him, where's from the beginning? When they saw him, Lord, he's not dressed for the weather here. So they could have the dual intent. You know, we're going to at least question him, and immediately this is a very fluid, fast-moving situation that happened probably five minutes where they're seeing a range finder, bulging pockets. The answers to the questions are raising their suspicions more. Like I said, he's not training for some mountain sport. He's out there. And he didn't give them an answer. You know, there were ranchers out in that same area, obviously, on snowmobiles. That's not part of the record, but checking their cows. I mean, could that have been an obvious answer? I'm checking my cows. There are people who run cows up there in the wintertime. That certainly wasn't something that he said. So all of this, you know, these are Montana cops. They know what's going on here. They're dressed for the weather. He's not. They're putting them in their cars, and they're not going to do that without making sure there's no weapons. And they know him. This is a small community. This does raise the issue that I've often wondered about this, you know, taking somebody down to the station for further questioning. It does. I mean, that seems to me that's an arrest. I understand. If he had said, no, I don't want to go down to the BIA office with you, I'd just as soon continue wandering through the snow here. Sure. And is that a possibility? I was thinking about that. Could they have just left him there if he said, no, they're not going to do that? I mean, that's just not going to work. We have a 1983 case out of Montana where that happened and the guy froze to death, and we said that was a legitimate civil rights action against the police. Absolutely. All right. Thank you, Ms. Sue. Thank you. Mr. Merchant, we'll give you the final word. Thank you, Your Honor. I'll be very brief. I just want to iterate to the Court that from the very inception, it's nice to play a second guessing of what the officer's intent was. But what he asked does not go to you're inappropriately dressed. What the officer does is not for officer's safety at first. It's because he's arresting them. Well, what is your response? The government seems to have conceded your view that from the get-go they were going to arrest him, but then it gets back to the issue of probable cause, which they did raise at the trial level. I gather you don't agree with that. You don't think there was probable cause. No, I don't. I appreciate it. I'm shocked. I appreciate the concession by the government. When the officer gets out of the car, we know he's going to arrest this gentleman. Yeah, he knows that there's been a burglary. He was at the scene, by the way. I don't know if the second officer was in the lead car. That was never developed. But there's no indication in the record as to what Officer Johnson knew had been taken besides the truck and whatever was in it. No, and, in fact, he did not know that the range finder had been taken. That's clearly in the record. And certainly not that Mr. Munter's pill bottle had been taken. No, and that also is a problem for our side. Well, okay. Thank you, Mr. Merchant, and thank you both, Counsel. The argument was very helpful, and this case will be submitted for decision. And, Mr. Merchant, please give my regards to Mr. Gallagher. All right.
judges: Tallman, Smith, Reavley